THE NEWARK AND SOUTH ORANGE HORSE CAR RAILWAY COMPANY v. EZRA M. HUNT AND JAMES W. HAWK.

The "Supplement to an act entitled 'An act to establish a state board of health,' approved March 9th, 1877," which supplement was approved March 12th, 1880 (*Pamph. L.*, p. 322), makes animals with contagious or infectious diseases common nuisances, and authorizes their destruc-

tion by certain officials under certain conditions. The "Supplement to an act entitled 'An act to prevent the spread of glanders in horses,' approved March 31st, 1864," which supplement was approved March 12th, 1884 (*Rev. Sup.*, *p.* 8), makes horses affected by glanders common nuisances, and authorizes their destruction by certain officers. *Held*—

1. These acts, so far as they relate to glanders in horses, are within the police powers of the state.

2. They are not within the prohibition of the fourteenth amendment to the federal constitution, because although they authorize the abatement of such nuisances in advance of a judicial adjudication of the fact of nuisance, yet they do not make the determination of the officials as to that fact conclusive, and only permit their acts, in abating the nuisance, to be justified by proof of the actual existence of such nuisance.

3. The conditions under which such officials may act, under the act of 1880, are mere limitations on their power for the benefit of the property owner, and their adjudication that such conditions exist will not protect them, unless the existence of the common nuisance is shown.

---

The action is in trespass, and by the declaration defendants are charged with killing certain horses of plaintiff, to its damage, &c.

The second, third and fourth pleas are special pleas.

The second plea avers that defendants were duly appointed assistants of the state board of health, and that by law it was the duty of such assistants, whenever any contagious disease should break out among animals in any locality and it should appear, in the judgment of such assistants, that such disease was not likely to yield to any remedial treatment, to cause the animals affected by such disease to be slaughtered; and that, at the times, &c., the contagious disease known as glanders had broken out in plaintiff's stables in South Orange, and the horses in question were affected therewith, and said disease was not likely, in defendants' judgment, to yield to any remedial treatment, wherefore the defendants slaughtered, &c., said horses, as it was lawful for them to do for the cause aforesaid.

The third plea avers the due appointment of defendants as assistants of said board, and that by law it was the duty of

such assistants, whenever any contagious disease should break out among animals in any locality, and it should appear, in the judgment of such assistants, that such disease threatened its spread to other animals, to cause the animals affected with such disease to be immediately slaughtered, and that at the times, &c., a contagious disease known as glanders had broken out in plaintiff's stables, and the horses in question were affected therewith, and said disease, in the judgment of defendants, threatened its spread to other animals, wherefore defendants slaughtered said horses, as it was lawful, &c.

The fourth plea avers the due appointment of the defendant Hunt as a member of said board, and of the defendant Hawk as an assistant thereof, and that by law it was the duty of each member of said board, whenever satisfied that any horse, &c., in this state was diseased with glanders, to cause such horse, &c., to be immediately slaughtered, and that at the times, &c., said horses were each diseased with glanders, and said Hunt was satisfied thereof, wherefore said Hunt, in discharge of the duty imposed, &c., directed said Hawk, assistant as aforesaid, to destroy, and said Hawk, in compliance with such directions, did destroy said horses, as it was lawful, &c.

Plaintiff filed a general demurrer to these pleas.

Argued at November Term, 1887, before BEASLEY, CHIEF JUSTICE, and Justices DIXON, REED and MAGIE.

For the plaintiff, *Chas. Borcherling* and *Cortlandt Parker*.

For the defendants, *J. P. Stockton, Attorney-General*, and *W. S. Gummere*.

The opinion of the court was delivered by

MAGIE, J.   The second and third pleas have evidently been based upon the provisions of the " Supplement to an act entitled 'An act to establish a state board of health,' approved March 9th, 1877," which supplement was approved March 12th, 1880.   *Pamph. L., p.* 322.

The fourth plea has evidently been based upon the provisions of the "Supplement to an act entitled 'An act to prevent the spread of glanders in horses,' approved March 31st, 1864," which supplement was approved March 12th, 1884. *Rev. Sup., p.* 8.

If any specifications of the causes of demurrer were demanded and furnished, they have not been printed, and the only objections to the pleas which will be considered are those which are shown in the brief of counsel.

The first objection seems addressed to the two pleas based upon the act of 1880. The contention is that the provisions of that act do not apply to horses. The first section of that act gave power to the state board of health to determine whether pleuro-pneumonia, rinderpest or any other contagious or infectious disease existed among animals in any county in the state. From the enumeration of two diseases which usually afflict animals of the bovine species, and from the fact that in a proceeding prescribed in the second section notice is required from the owner of "said cattle," it is argued that the provisions of the act are to be restricted to animals ordinarily called cattle, that is, to horned or neat cattle.

But the word "cattle" is defined as including all domestic quadrupeds, such as horses, mules, &c., as well as oxen, cows, &c. *Worcester's Dict., tit. "Cattle."* It has been held to bear a legal significance which includes horses. *Rex* v. *Paty,* 2 *W. Bl.* 721. The word "animals," elsewhere used in every part of the act, has a signification broad enough to include horses. When the legislature expressly gives power in respect to any contagious or infectious disease among animals, I see no reason to limit the intention within narrower bounds than will be set by the acceptance of the words giving power in their natural meaning. Thus accepted, a contagious disease affecting horses plainly comes within the act.

It is next objected that the provisions of the act of 1884 cannot be resorted to, in support of the fourth plea, because the trespass charged in the declaration is there said to have been committed on August 1st, 1883. But the trespass is in

fact charged in the declaration to have been committed on August 1st, 1883, and on divers days and times between that day and the commencement of the suit, which was in March, 1886. The act of trespass charged in the declaration is, however, one of a nature not possible to be continued. Laying a trespass of that nature with a *continuando*, or on divers days and times, was formerly bad on special demurrer. When so laid, upon objection made at the trial, the plaintiff was confined to evidence of a single trespass, but might prove any trespass committed before the commencement of the suit. 1 *Campb.* 24, *n.* 1. Since, therefore, under the declaration, the plaintiff could prove any killing of horses by defendants on any day prior to the commencement of the suit in March, 1886, defendants may properly set up the power conferred by the act of March 12th, 1884, as a justification for any killing which they admit after the latter date. The fourth plea does no more than this, and is not open to this objection.

It is next objected that the acts in question are within the prohibition of that clause of the fourteenth amendment of the federal constitution which reads: " Nor shall any state deprive any person of life, liberty or property without due process of law."

This is the only constitutional objection urged, and no other has been considered. The power to abate any condition of things which from its injurious effect on public rights, public convenience or public morals, constituted a common nuisance, was a recognized part of the common law scheme of government, brought to this country from England. In the complex system of government developed here, it is well settled that the states, under the powers called police powers, may, by legislative action, define common nuisances and declare what condition of things shall constitute such nuisances. It is equally well settled that the states have power to abate what are thus declared to be public or common nuisances, and that without making compensation to the owners of property thus interfered with or destroyed. *Cooley's Const. Lim.,* ch. 16; *Mills on Eminent Domain,* § 6.

The fourteenth amendment does not impair the police powers of the states, when so exercised as to restrain equally all those affected, and when an equal opportunity to be heard is afforded before a judicial determination affecting personal rights or rights of property is made. *Barbier* v. *Connolly,* 113 *U. S.* 27; *Wurts* v. *Hoagland,* 114 *U. S.* 606.

This court has sustained legislation adopted under the police powers where it gave authority to abate what was declared to be publicly injurious, by the destruction of property without compensation. *Weller* v. *Snover,* 13 *Vroom* 341; *Shivers* v. *Newton,* 16 *Vroom* 469.

The acts in question have evidently been passed in the exercise of the police powers of the state. By their terms there is disclosed a legislative intent to place in the category of common nuisances all animals having contagious or infectious diseases and all horses having glanders, and this is recognized as within those powers. Thus, animals coming within the provisions of the act of 1880 may, under certain circumstances, be slaughtered, and are required to be, in all cases, quarantined and subjected to the control and regulation of the board of health, while by the provisions of the act of 1884 all glandered horses are to be destroyed.

It was probably within the power of the legislature to have authorized any person to abate such nuisances by the destruction of such animals. But following the policy adopted in the Fish acts and the Milk act, which were discussed in the cases last cited, the legislature wisely placed the power to abate in the hands of officials, who may be supposed to act under a due sense of their responsibility, as well to the property owner as to the public.

It was within the power of the legislature to authorize such officials to abate such nuisances without other prerequisites to the exercise of such authority save the existence of the prescribed disease, of which they must, of course, primarily form a judgment. This is the scheme of the act of 1884, which gives to any member of the board of health authority to destroy horses having glanders, if he is satisfied of the fact.

The act of 1880 is more restricted and only gives power to abate such nuisances when the officials judge that the disease (which by implication they have determined to exist and to be contagious or infectious) is not likely to yield to remedial treatment or threatens to spread to other animals. But this judgment of the officials in respect to the virulence of the disease or its threatened spread is not an adjudication upon the existence of a nuisance, for that the law has declared to exist whenever a disease of the specified kind exists. The requirement that the officials, before proceeding to abate, shall form a judgment or opinion respecting the probabilities of cure or the likelihood of the disease spreading, is in the nature of a limitation on the officials' power in ease of the property owner, and to afford him an opportunity, under certain circumstances, to retain property which is, in fact, a common nuisance, and which might justly be required to be abated.

Plaintiff, however, contends that the determination of the officials that the prescribed disease exists is to be made without notice to the property owners and without affording them an opportunity to be heard, and on this ground claims that these acts are obnoxious to the constitutional provision invoked. If the legislature by these acts has made the determination of these officials, as to the existence of the common nuisance, a conclusive adjudication upon the rights of the property owner, then it is perfectly obvious that this legislation cannot be supported. It has been settled in this state that it is not within the power of the legislation to impart to a determination of this sort a conclusive character as against the property owner, and legislation intending that result was held to be futile. *Hutton* v. *Camden*, 10 *Vroom* 122.

An examination of the acts in question clearly shows that there was no intent in the legislative mind to make the conclusions of the officials decisive of the right of the property owner as to the existence of that condition of things which these acts declared would constitute, in these cases, a common nuisance, and would justify its abatement by the destruction of the animals diseased. The right of the property owner is not thereby

barred, on the one hand, nor is the justification of the officials made effective, on the other hand, by reason of their adjudication, but by reason of the fact that the common nuisance declared by the acts existed, and so existed as to permit the officials to exercise the power of abatement. What the acts authorize is the abatement of an actual nuisance. They afford no protection to any invasion of the rights of property in any other case.

There is nothing in the decision in *Hutton* v. *Camden*, *supra*, or in the learned and well-considered opinion of the Chief Justice, which gives the least countenance to the notion that the legislature may not authorize the abatement of a common nuisance until after its character as a nuisance has been determined in a judicial proceeding, with the safeguards of notice and opportunity to the property owner to be heard. Such a doctrine enforced by the courts would interpose an almost absolute barrier to the praiseworthy efforts everywhere made to prevent preventible diseases and to stamp out contagion and infection affecting public health and comfort, and would render much of the health legislation of to-day of no avail. But I think it cannot be claimed that the rights of a property owner will be improperly interfered with by legislation authorizing the abatement of nuisances of this character, although in advance of a judicial adjudication, provided such an adjudication and full opportunity to be heard is not denied, but may be evoked and compelled. As has been said in this court, every property owner holds the title to his property subject to the paramount consideration of the health and safety of the public, and the power of the legislature to fix upon it, when in certain conditions, the brand of noxiousness to public safety or health. If his property, in common with other property of the same sort, has been legally declared to be subject to destruction, when in certain conditions noxious to the public, he cannot complain of its destruction if it was in fact in those conditions. It has never been pretended that the fourteenth amendment worked the abolition of the common law rule which justified any one specially affected by a

nuisance in abating it without waiting for an adjudication that it was a nuisance which he might abate, but unless the fact of the nuisance was established by proof he was liable to the aggrieved property owner as for an unwarranted trespass. The amendment was, in my judgment, likewise ineffectual to prevent the state from providing, under its police powers, for the immediate abatement of public nuisances actually existing, though not yet judicially adjudged nuisances. In such case the officer entrusted with the power of abatement could not be protected if he destroyed property without the existence of those conditions which make it a common nuisance and justify its destruction. But if the property owner is not deprived of a right to contest the existence of such conditions and to obtain redress as for a trespass if they are not shown to have existed, such legislative acts would not infringe any constitutional provision.

These acts, being of the character above indicated, are not open to this objection.

The pleas in question are drawn in conformity with the construction I have thus put on the acts. While they severally aver the judgment of the defendants as to the existence, virulence and probability of the spread of the disease, which averment seems necessary, because otherwise the power to abate the nuisance was not granted, they place the justification of defendants upon the existence, in the horses destroyed, of a contagious disease called glanders. This fact, if true, made the horses a common nuisance, and justified their destruction under the circumstances. The matter was therefore presented for judicial determination, and by plaintiffs taking issue on the pleas an adjudication could have been compelled. The demurrer admits the justification and the pleas are a complete answer to the case made in the declaration.

One objection still remains to be considered. Plaintiff contends that on a proper construction of the act of 1880 the adjudication that the disease is not likely to yield to remedial treatment or threatens to spread to other animals is to be made by the board of health, and cannot be made by the as-

Grosso v. Del., L. & W. R. R. Co.

sistants. The language of section 3, which gives this power, does not, in my judgment, admit of such a construction. Its reasonable construction devolves the power to slaughter upon the assistants of the board, upon their judgment that the disease is not likely to yield to remedial treatment or threatens to spread.

For these reasons I conclude the pleas must be sustained, and the defendants have judgment on the demurrer.